592 So.2d 156 (1991)
Barbara MOORE
v.
MOBILE INFIRMARY ASSOCIATION.
89-1087.
Supreme Court of Alabama.
September 27, 1991.
Rehearing Denied January 3, 1992.
*157 Gregory B. Breedlove and Andrew T. Citrin of Cunningham, Bounds, Yance, Crowder and Brown, Mobile, for appellant.
W. Michael Atchison, W. Stancil Starnes, Laura H. Peck and A. Sybil Vogtle of Starnes & Atchison, Birmingham, for appellee.
Jack Drake of Drake, Knowles & Pierce, Tuscaloosa, for amicus curiae Alabama Trial Lawyers Ass'n.
ADAMS, Justice.
Barbara Moore appeals from a judgment reducing the amount of damages awarded to her by the jury in a medical malpractice case against Mobile Infirmary Association ("Infirmary"). We reverse.
The undisputed facts reveal that on September 8, 1988, Barbara Moore entered the Infirmary's health care facility for treatment of lower back pain. Her physician prescribed bed rest, traction, physical therapy, pain medications, muscle relaxants, and anti-inflammatory agents. As a sedative, he prescribed periodic muscular injections of "sparine."
On September 18, a nurse injected sparine into Ms. Moore's right forearm, an improper location for such an injection. The injection caused an immediate "burning sensation," followed by a loss of feeling in portions of the right hand. The numbness in her right hand persisted after her discharge from the Infirmary.
On September 21, 1988, Ms. Moore suffered third-degree burns to her little finger while cooking. Because of the absence of sensation in her hand, she was unaware of the significance of the injury until the affected area became gangrenous. The gangrenous condition eventually required amputation of the right little finger. Her right ring finger has also become permanently anesthetized and contracted, and she is expected to experience permanent pain in other areas of her right hand and arm.
Ms. Moore filed an action against the Infirmary in which she sought compensatory and punitive damages, including damages for "physical pain and mental anguish," physical impairment, and disfigurement as a result of alleged negligence or wantonness of the Infirmary's employees. At trial, the Infirmary consented to the entry of a directed verdict against it in favor of Barbara Moore on the issue of liability. The jury, after considering only the issue of damages, returned the following verdict: "We, the jury, assess the plaintiff's damages as follows: Past damages, four hundred thousand dollars; future damages, two hundred thousand dollars. It is our intention to assess total damages to the plaintiff at six hundred thousand dollars."
The trial judge, pursuant to Ala.Code 1975, § 6-5-544(b), reduced the amount of the award of noneconomic damages to $400,000 and entered a judgment against the Infirmary in the amount of $459,000. The judgment thus included the sums of $59,000, which represented economic damages for lost earnings and medical expenses, and $400,000 in damages for noneconomic loss, as defined by the statute. On appeal, the only issue presented for review is whether the statute's limitation on the amount of noneconomic damages that a jury may award offends the Constitution of Alabama of 1901.
Section 6-5-544(b) was enacted as part of the Alabama Medical Liability Act of 1987. Act. No. 87-189, § 5, 1987 Ala.Acts 261. The statute provides:
"In no action shall the amount of recovery for noneconomic losses, including *158 punitive damages, either to the injured plaintiff, the plaintiff's spouse or other lawful dependents or any of them together exceed the sum of $400,000.00. Plaintiff shall not seek recovery in any amount greater than the amounts described herein for noneconomic losses. During the trial of any action neither the court nor any party shall advise or infer to the jury that it may not return an award for noneconomic losses in excess of an amount specified herein; in the event the jury is so advised or such inference is made, the trial court, upon motion of an opposing party, shall immediately declare a mistrial. Any verdict returned which includes an award for noneconomic losses in an amount greater than that permitted herein shall be reduced by the trial court to an amount which will include an award for noneconomic losses no greater than that permitted herein or to such lesser sums as the trial court deems appropriate in accordance with prevailing standards for reducing excessive verdicts."
Id. Section 6-5-544(a) defines "noneconomic loss" as "losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium and other nonpecuniary damage."
Ms. Moore contends that § 6-5-544(b) violates various provisions of the Declaration of Rights, which composes article one of the Constitution of Alabama. In particular, she insists that the statutory ceiling on damages violates (1) the right to trial by jury as guaranteed by Ala. Const. art. I, § 11, (2) guarantees of equal protection and due process, (3) the right-of-access-to-courts provision of Ala. Const. art. I, § 13, and (4) the separation of powers provisions of Ala. Const. art. III, §§ 42, 43. Ms. Moore does not challenge the validity of § 6-5-544(b) under any provision of the United States Constitution; therefore, our analysis and conclusions regarding the constitutionality of § 6-5-544(b) are based entirely on adequate and independent state law grounds.
Our disposition of this case is facilitated by reference to the substantial body of case law that has evolved from constitutional challenges brought in the highest courts of other states to statutes imposing damages "caps" of various types. As of the date of this opinion, it appears that the majority of courts reviewing challenges under the constitutions of their respective states have invalidated limitations on damages. See, e.g., Smith v. Department of Ins., 507 So.2d 1080 (Fla.1987) (statute imposing a $450,000 cap on noneconomic damages recoverable in actions for personal injury violated open courts provision); Wright v. Central Du Page Hosp. Ass'n, 63 Ill.2d 313, 347 N.E.2d 736 (1976) ($500,000 limitation on recovery in medical malpractice actions violated equal protection guarantee); Brannigan v. Usitalo, 134 N.H. 50, 587 A.2d 1232 (1991) (statute imposing $875,000 limitation on noneconomic damages recoverable in actions for personal injury violated state constitution's equal protection guarantee); Carson v. Maurer, 120 N.H. 925, 424 A.2d 825 (1980) (statute imposing $250,000 limitation on noneconomic damages recoverable in medical malpractice actions violated state constitution's equal protection guarantee); Arneson v. Olson, 270 N.W.2d 125 (N.D.1978) (statute imposing $300,000 limit on damages recoverable in medical malpractice action violated state and federal equal protection guarantees); Morris v. Savoy, 61 Ohio St.3d 684, 576 N.E.2d 765 (1991) (statute imposing $200,000 limit on "general" damages recoverable in medical malpractice action violated state due process guarantee); Lucas v. United States, 757 S.W.2d 687 (Tex. 1988) (statute limiting liability to $500,000 for damages in medical malpractice actions violated open courts provision); Condemarin v. University Hosp., 775 P.2d 348 (Utah 1989) (statute limiting medical malpractice liability of state hospital to $100,000 violated provisions of state constitution); Sofie v. Fibreboard Corp., 112 Wash.2d 636, 771 P.2d 711 (1989) (statute imposing a cap on noneconomic damages for personal injury at a rate of 0.43 × average annual wage and life expectancy violated right to jury trial under provision of state constitution); see also L. Nelson, Tort Reform in Alabama: Are Damages *159 Restrictions Unconstitutional? 40 Ala. L.Rev. 533 (1989). Contra, Fein v. Permanente Medical Group, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985) (statute limiting recovery for noneconomic loss to $250,000 in action for medical malpractice did not violate equal protection or due process guarantees); Johnson v. Saint Vincent Hosp., Inc., 273 Ind. 374, 404 N.E.2d 585 (1980) (statute limiting medical malpractice liability to $500,000 did not violate right-to-remedy, jury trial, equal protection, or due process provisions of state constitution); Samsel v. Wheeler Transp. Serv., Inc., 246 Kan. 336, 789 P.2d 541 (1990) ($250,000 limitation on recovery for noneconomic loss due to personal injury did not violate right-to-remedy or jury trial provisions of state constitution where legislature had provided sufficient quid pro quo); Etheridge v. Medical Center Hosp., 237 Va. 87, 376 S.E.2d 525 (1989) (statute limiting total recovery against a health care provider to $750,000 did not violate right to jury trial, due process, or equal protection; separation of powers provision; or special legislation prohibitions).
In reviewing the constitutionality of a statute, we "approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government." Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944). Nevertheless, if it clearly appears that an act of the legislature unreasonably invades rights guaranteed by the Constitution, we have not only the power but the duty to strike it down. City of Russellville v. Vulcan Materials Co., 382 So.2d 525 (Ala.1980); Peddycoart v. City of Birmingham, 354 So.2d 808 (Ala.1978).

I. Right to Trial by Jury
The right to a jury trial in the courts of this state is guaranteed by Ala. Const. art. I, § 11. Section 11 provides in toto: "That the right of trial by jury shall remain inviolate." As we explained in Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), the "crucial words" found in that section are "`shall remain inviolate.'" The clause "forbid[s] the state through the legislative, judicial, or executive departmentone or allfrom ever burdening, disturbing, qualifying, or tampering with this right to the prejudice of the people." Id. at 271, 292 So.2d at 655. Section 11 "freezes" the right to trial by jury as that right existed in 1901, the date of the ratification of our present Constitution. Id. at 269, 292 So.2d at 652; see also J. Hoffman, Alabama's Right to Trial by Jury in Civil Cases Since the Merger of Law and EquityWhat Has Changed and What Has Not, 32 Ala.L.Rev. 465, 488-89 (1981).
It is undisputed that juries were employed in Alabama in 1901 to assess "quality of life" damagesdamages for pain, suffering, and other noneconomic loss in actions alleging negligent personal injury. See, e.g., Ensley Ry. v. Chewning, 93 Ala. 24, 9 So. 458 (1891); South & North Alabama R.R. v. McLendon, 63 Ala. 266 (1879); Barbour County v. Horn, 48 Ala. 566 (1872).
The Infirmary contends, however, that "Article 1, Section 11 of the Alabama Constitution does not state that the plaintiff's inviolate right to a trial by jury includes the right to have the jury determine the actual amount of damages that the plaintiff will receive." Brief of Appellee, at 62 (emphasis added). It insists that the "Alabama Constitution, like the Federal Constitution, is silent on the question of whether a jury must determine the amount of recovery in a trial in which the jury determines issues of liability." Id. at 63. It thus argues, in effect, that the jury's factual determinations regarding the value of the plaintiff's injuries are not entitled to constitutional protection; therefore, it says, the right to trial by jury is simply not implicated by the actions of the trial court that disturb those determinations.
In support of this proposition, the Infirmary contends that the legislative imposition of a damages cap impairs the right to a jury trial no more than traditional forms of judicial supervision of damages assessments, such as remittitur, through which the prevailing party is given the option to *160 remit a portion of an excessive verdict as an alternative to a new trial. Consistent with its contention that § 11 guarantees do not extend to the remedy phase of the trial, the Infirmary contends that remittitur "does not deny a plaintiff his right to a trial by jury." Id. at 70. For the same reasons, the argument goes, § 6-5-544(b) does not invoke § 11.
We agree that these forms of judicial supervision, as they are presently employed in this state, do not offend the Constitution of Alabama; however, that is not because they do not implicate the right to a jury trial. On the contrary, these practices clearly implicate the right to trial by jury. See C. Wright & A. Miller, Federal Practice and Procedure § 2815, at 99-103 (1973); Carlin, Remittiturs and Additurs, 49 W.Va.L.Q. 1, 3-4 (1942); Note, Remittitur Practice in the Federal Courts, 76 Colum.L.Rev. 299, 310-11 (1976); Commentary, Remittitur Practice in Alabama, 34 Ala.L.Rev. 275, passim (1983).
The constitutional implications inherent in interference with jury awards through orders granting remittitur or a new trial were acknowledged by the appellate courts of Alabama early in this century. In Montgomery Light & Traction Co. v. King, 187 Ala. 619, 65 So. 998 (1914), this Court discussed the constitutional underpinnings of the jury's findings on the amount of damages. In that case, the Court said:
"The injuries to the plaintiff were serious, painful, and permanent; but, as the law is, in such a case, unable to furnish a certain rule for the admeasurement of damages, the jury and the jury alone, in their sound discretion and judgment, after considering all the evidence, had the right to say what sum should be awarded the plaintiff as compensation to her for her injuries. In a case like this a trial court is by the lawwhich protects and provides for trial by juryinvested with no right to set aside such a verdict upon the ground of excessiveness or inadequacy alone unless the amount allowed by the verdict is so excessive or inadequate as to plainly indicate that the verdict was produced `by passion or prejudice or improper motive.' In this case, as already said, the amount allowed by the jury was substantial, and in fixing the amount the jury were acting within their exclusive sphere...."
187 Ala. at 621, 65 So. at 998. (Emphasis added.) Similarly, the Court of Appeals cautioned:
"To permit a trial judge to substitute his judgment on the facts for that of the jury, or to give undue presumption to the action of the trial judge in dealing with verdicts, would minimize the jury system[, render] juries advisers of the trial judge rather than a positive force in the administration of justice, and would be `an entering wedge' to a destruction of jury trials...."
Thompson v. Southern Ry., 17 Ala.App. 406, 408, 85 So. 591, 592-93 (1920). See also Castleberry v. Morgan, 28 Ala.App. 70, 72, 178 So. 823, 824 (1938) (power of the trial judge to set aside a damages award is circumscribed by the right of trial by jury "upon whom, by the law, is fixed the duty of ascertaining this very question").
In that connection, this Court has consistently regarded the authority to interfere with the jury's findings on the amount of damages as one to be exercised with great caution. Vest v. Gay, 275 Ala. 286, 154 So.2d 297 (1963); Airheart v. Green, 267 Ala. 689, 104 So.2d 687 (1958); Woodward Iron Co. v. Earley, 247 Ala. 556, 25 So.2d 267 (1946); Central of Georgia Ry. v. White, 175 Ala. 60, 56 So. 574 (1911); Montgomery Traction Co. v. Knabe, 158 Ala. 458, 48 So. 501 (1908). The jury's role in fixing the amount of damages has been regarded as particularly sacrosanct in cases involving damages not susceptible of precise measurement. Alabama Power Co. v. Mosley, 294 Ala. 394, 401, 318 So.2d 260, 266 (1975) ("[t]here is no fixed standard for ascertainment of compensatory damages recoverable ... for physical pain and mental suffering, but the amount of such award is left to the sound discretion of the jury"); Austin v. Tennessee Biscuit Co., 255 Ala. 573, 52 So.2d 190 (1951); Sheffield Co. v. Harris, 183 Ala. 357, 61 So. 88 (1912); Montgomery Light & Traction Co. v. King, 187 Ala. 619, 65 So. 998 *161 (1914); C. Gamble, Alabama Law of Damages § 7-5, at 50 (2d ed. 1988); Commentary, Remittitur Practice in Alabama, 34 Ala.L.Rev. 275, 285-86 (1983) ("granting a remittitur option" in cases involving "intangible factors such as pain and suffering ... invade[s] the province of the jury").
This Court has often cautioned against interference with a jury's damages assessment unless the particular assessment is flawed by bias, passion, prejudice, corruption, or other improper motive. See Kabel v. Brady, 519 So.2d 912 (Ala.1987); Hickox v. Vester Morgan, Inc., 439 So.2d 95 (Ala. 1983); Alabama Fuel & Iron Co. v. Andrews, 215 Ala. 92, 109 So. 750 (1926); Montgomery Light & Traction Co. v. King, 187 Ala. 619, 65 So. 998 (1914); Commentary, Remittitur Practice in Alabama, 34 Ala.L.Rev. 275, 278 (1983). Recently, we have specifically identified the sole rationale upon which rests the authority to set aside a verdict thus flawed.
In Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), we reversed a judgment ordering the plaintiff to file a $10,000 remittitur in lieu of a new trial. We began our discussion by articulating a rationale that had previously remained largely implicit:
"We begin by recognizing that the right to a trial by jury is a fundamental, constitutionally guaranteed right, Art. I, § 11, Const. of 1901, and, therefore, that a jury verdict may not be set aside unless the verdict is flawed, thereby losing its constitutional protection. It is only in those cases that [the judiciary] may interfere with a jury verdict."
Id. at 1378 (emphasis added). Otherwise expressed, in cases involving damages that are incapable of precise calculation, a jury's damages assessment may be disturbed only when it is so flawed by bias, passion, prejudice, corruption, or improper motive as to lose its constitutional protection.
Consistent with this rationale, Hammond held that trial courts thereafter would be required to "reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." Id. at 1379. We then set forth standards by which trial courts should evaluate the soundness of the damages assessment in each particular case. Id.
Two years later, we revisited the relationship between the right to a jury trial and the sanctity of damages awards. City Bank of Alabama v. Eskridge, 521 So.2d 931 (Ala.1988). In that case, the bank filed a motion for a new trial on the grounds that the damages were excessive. In denying the motion, the trial judge, using factors such as those we suggested in Hammond, expressed in the record his reasons for refusing to disturb the award. In affirming the denial of a motion for a new trial, we again explained: "The right to a trial by jury in civil cases is guaranteed by § 11, Alabama Constitution; therefore, a jury verdict will not be set aside unless it is flawed, thereby losing its constitutional protection." Id. 493 So.2d at 932. This Court held, therefore, that it had no authority to disturb the damages award in that case because the "presumption of correctness of the jury verdict [was not] overcome by a clear showing that the amount of the verdict [was] the product of bias, passion, prejudice, corruption, or other improper motive." Id. at 933.
Similarly, in Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala.1989), we refused to disturb a jury verdict alleged to be excessive. The appellant contended, inter alia, that the Eighth Amendment proscription against cruel and unusual punishment required punitive damages awards to be assessed by the trial judge on the basis of factors identical to those we set forth in Hammond. In response to that argument, we said:
"We are unwilling to allow the trial court authority to limit a damages award as a matter of law, as Industrial Chemical would suggest. A jury determination of the amount of damages is the essence of the right to trial by jury to go beyond the procedural mechanisms now in place for reduction of a verdict and to bind the jury's discretion is to deny this constitutional right."
*162 Id. at 819 n. 1. (Emphasis added.) In an extended opinion on application for rehearing, we again stated that "[t]o limit the jury's discretion other than by proper instruction as to the circumstances under which ... damages are awarded, would appear to violate the right of trial by jury guaranteed by Article I, § 11, of the Alabama Constitution of 1901."[1]Industrial Chemical & Fiberglass Corp., 547 So.2d at 837 n. 2. On the return to the remand, we also explained that the jury's right to fix the amount of damages precludes the use of an "ironclad rule in considering the adequacy or excessiveness of a verdict. Each case must be determined by its own facts and on its own merits." Id. at 833.
Even more recently, Justice Kennedy provided additional insight into the scope of § 11 protection. In Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala. 1991), he concluded that §§ 6-11-23(a), -24(a), and a portion of the final sentence of -23(b) violated the right to trial by jury. 581 So.2d at 421. He reasoned that these sections violated § 11 because they authorized "courts to disregard the verdict and to reassess the award of damages regardless of the propriety of the verdict rendered in the case." Id. at 422. (Kennedy, J., concurring specially.) (Emphasis added.) Moreover, he explained:
"Destruction of the presumption of correctness that attends the verdict degrades the verdict to nothing more than a preliminary advisory decision of ephemeral weight and substance, meaningful and significant only insofar as it comports with the decision of the trial court, which, with no necessary regard for the verdict, determines what it will award. The constitutional right of trial by jury provided by § 11 is a right to have the verdict accorded efficacy and binding effect, unless it is flawed. To destroy the presumption of correctness that attends the verdict and thus to allow the trial court and appellate courts to rule without regard to the verdict violates the right of trial by jury at its most fundamental level."
Id. at 422-23. (Emphasis added.)
From the foregoing discussion, two essential principles emerge. First, in cases involving damages incapable of precise measurement, a party has a constitutionally protected right to receive the amount of damages fixed by a jury unless the verdict is so flawed by bias, passion, prejudice, corruption, or improper motive as to lose its constitutional protection. As a corollary to that principle, the soundness of a jury's findings on the issue of damages must be evaluated on a case by case basis. Durham v. Sims, 279 Ala. 516, 517, 187 So.2d 558, 559 (1966) ("[w]hether damages awarded for personal injuries are excessive depends on the facts of the particular case"); Birmingham Electric Co. v. Howard, 250 Ala. 421, 423, 34 So.2d 830, 831 (1948). Were it otherwise, interference would be palpably invalid.
Viewed in this light, we can hardly countenance the Infirmary's contention that juries' damages assessments are not entitled to constitutional protection. Indeed, we might be inclined to regard the argument as specious had it not been endorsed in a recent decision by the Supreme Court of Virginia.
In Etheridge v. Medical Center Hosp., 237 Va. 87, 376 S.E.2d 525 (1989), the court, against a challenge based on the right to trial by jury as provided in the Virginia constitution, upheld a statute limiting a total recovery against a health care provider to $750,000. The court conceded that the "jury's fact-finding function extend[ed] to the assessment of damages." 237 Va. at 96, 376 S.E.2d at 529. It then reasoned, however, that "although a party has the right to have a jury assess his damages, he has no right to have a jury dictate through an award the legal consequences of its assessment." The court concluded that the *163 right to a jury trial is not impaired where the "trial court applies the [statute's] limitation only after the jury has fulfilled its fact-finding function." 237 Va. at 96, 376 S.E.2d at 529 (emphasis in original).[2]
The weakness of Etheridge's reasoning was aptly observed in Sofie v. Fibreboard Corp., 112 Wash.2d 636, 771 P.2d 711 (1989). The Supreme Court of Washington noted that the Etheridge court's analysis of the jury's function placed form over substance.[3] More specifically, the Court declared that the "undoing of Etheridge's reasoning" was that it "bypassed" a constitutional guarantee, thus "allowing it to exist in form but letting it have no effect in function." 112 Wash.2d at 660, 771 P.2d at 724.
In deference to the Supreme Court of Virginia, we must point out that the relevant provision of the constitution of Virginia is materially distinguishable from its Alabama counterpart. While the Constitution of Alabama provides that the right to a jury trial must "remain inviolate," Va. Const. art. I, § 11, provides merely that "in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred." (Emphasis added.) Regardless of the source of the conclusion in Etheridge, however, it is clear that the damages assessments of Alabama juries are protected by the constitutional guarantee of the right to trial by jury. Thus, if § 6-5-544(b) burdens or impairs that right, and we conclude that it does, the statute offends the Constitution.
Under the procedure mandated by § 6-5-544(b), a jury is empanelled and deliberates, with the expectation that its verdict will have efficacy, an issue of fact singularly within its authority. At the conclusion of deliberations, however, the trial judge is required summarily to disregard the jury's assessment of the amount of noneconomic loss, that species of damages lying most peculiarly within the jury's discretion. See Alabama Power Co. v. Mosley, 294 Ala. 394, 318 So.2d 260 (1975); Durham v. Sims, 279 Ala. 516, 187 So.2d 558 (1966); W.S. Fowler Rental Equipment Co. v. Skipper, 276 Ala. 593, 165 So.2d 375 (1963). To the extent that the assessment exceeds the predesignated ceiling, the statute allows no consideration for exigencies presented by each case. Such a requirement has no parallel in the jurisprudence of this state and is patently inconsistent with the doctrines of remittitur or new trial as we have applied them.[4] See also Smith v. Department of Ins., 507 So.2d 1080, 1088-89 (Fla.1987) ("Nor, we add, because the jury verdict is being arbitrarily capped, is the plaintiff receiving the constitutional benefit of a jury trial as we have heretofore understood that right").
It is not relevant, under a § 11 analysis, that the statute has not entirely abrogated the right to empanel a jury in this type of case. The relevant inquiry is whether the function of the jury has been impaired. Because the right to a jury trial "as it existed at the time the Constitution of 1901 was adopted must continue `inviolate,'" the pertinent question "is not whether [the right] still exists under the statute, but *164 whether it still remains inviolate." Alford v. State ex rel. Attorney General, 170 Ala. 178, 197, 54 So. 213, 218 (1910) (Mayfield, Sayre, and Evans, JJ., dissenting). "For such a right to remain inviolate, it must not diminish over time and must be protected from all assaults to its essential guaranties." Sofie v. Fibreboard Corp., 112 Wash.2d 636, 656, 771 P.2d 711, 722 (1989).
Because the statute caps the jury's verdict automatically and absolutely, the jury's function, to the extent the verdict exceeds the damages ceiling, assumes less than an advisory status. This, as our cases illustrate, is insufficient to satisfy the mandates of § 11. See Thompson v. Southern Ry., 17 Ala.App. 406, 408, 85 So. 591, 592-93 (1920). A "constitution deals with substance, not shadows. Its inhibition [is] leveled at the thing, not the name." Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 325, 18 L.Ed. 356 (1866). Consequently, we hold that the portion of § 6-5-544(b), imposing a $400,000 limitation on damages for noneconomic loss represents an impermissible burden on the right to a trial by jury as guaranteed by § 11 of the Constitution of Alabama.
Contrary to the position taken by Mr. Justice Houston in his special concurrence, we see no significance in the fact that the jury is not informed of the amount of the ceiling. In our view, it is entirely inconsistent with law and logic to hold, as he suggests, that a jury's constitutionally protected factfinding function is impaired solely because the jury is unable to apply the law to its factual determinations, but that its function would be unimpaired if it knew that its findings would have no legal validity. The practical effect of the damages limitation, laying aside all reasoning based on pure sophistry, is to prevent the jury from applying the facts. Mr. Justice Houston's proposal serves only as a means through which to avoid the real issue. Consequently, the constitutional infirmity of § 6-5-544(b) cannot be cured merely by eliminating that portion of the statute that precludes any suggestion to the jury of the presence of the damages limitation.
The Infirmary also relies on Tull v. United States, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). That case involved an action by the Federal Government against a real estate developer for violation of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376, in which the finder of fact was not specified. The United States Supreme Court held that under § 1319, which authorized the imposition of a "noncompensatory [civil penalty] to enforce direct exercise of [Congressional] regulatory authority," the Seventh Amendment required a jury determination of liability, but not of the amount of damages. Tull, 481 U.S. at 428, 107 S.Ct. at 1841. (Emphasis added.)
The Infirmary urges this Court to uphold § 6-5-544(b), based on the holding and rationale in Tull. We decline to do so. The provisions of the Seventh Amendment are not binding upon state courts. Minneapolis & St. Louis R.R. v. Bombolis, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916). Decisions of federal courts based on the Seventh Amendment are, therefore, instructive but not compulsory. Kraas v. American Bakeries Co., 231 Ala. 278, 164 So. 565 (1935). More significantly, the analogy between a federal act imposing penalties and a common law negligence action involving compensatory damages is too attenuated to support such an extension of rationale as that urged by the Infirmary. Tull, therefore, is inapposite.
The Infirmary also directs us to various statutes that have never been invalidated by this Court and contends that, by analogy, § 6-5-544(b) does not violate § 11. In particular, it cites Ala.Code 1975, § 9-6-14 (immunizing pollution control authorities from tort liability), § 11-93-2 (limiting tort liability of governmental entities to $100,000), § 25-5-11(a) (immunizing coemployees from liability for negligence and wantonness), § 32-1-2 (immunizing motor vehicle operators from liability for negligent injury to guest passengers), and § 6-5-331 (abolishing causes of action for alienation of affections). The Infirmary's reliance on this analogy is misplaced.
*165 For example, in Reed v. Brunson, 527 So.2d 102 (Ala.1988), we upheld the constitutionality of Act No. 85-41, § 3, 1984 Ala. Acts 44 (codified at Ala.Code 1975, § 25-5-11(a)) against a challenge based on Ala. Const. art. I, § 13. Act No. 85-41 entirely abrogated causes of action by a worker against coemployees for injuries suffered as the result of the negligence or wantonness of the coemployees. Where the legislature completely abolishes a cause of action, "the right to trial by jury becomes irrelevant." Sofie v. Fibreboard Corp., 112 Wash.2d at 651, 771 P.2d at 719 (1989); see also Mountain Timber Co. v. Washington, 243 U.S. 219, 235, 37 S.Ct. 260, 263, 61 L.Ed. 685 (1917). In other words, the right to a trial by jury does not arise in the absence of a cause of action requiring a finder of fact.[5] Section 25-5-11(a), therefore, does not implicate § 11.
For the same reasons, the right to a jury trial is not impaired by § 32-1-2, in which the legislature completely abolished a cause of action in negligence against a guest passenger. See Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939) (upholding the predecessor of § 32-1-2 against a constitutional challenge based on § 13).
We have never addressed a challenge to the validity of § 11-93-2 based on § 11. In Home Indemnity Co. v. Anders, 459 So.2d 836 (Ala.1984), we upheld § 11-93-2 against allegations that the section violated the open courts provision of § 13. We specifically declined to address the contention that the statute impaired the right to a jury trial, because that ground had not been pressed in the trial court. Id. at 840. Consequently, neither that case nor any subsequent case reviewing § 11-93-2 can be advanced in support of the Infirmary's contention that § 6-5-544(b) does not violate § 11.
This Court has never addressed on any grounds a challenge to the constitutionality of § 9-6-14 or § 6-5-331. Statutes are presumed to comport with the constitution "[u]ntil assailed by a party whose rights are specially affected." Home Indemnity Co., 459 So.2d at 845 (Jones, J., concurring specially); see also Jones v. Black, 48 Ala. 540 (1872). We thus find nothing in the case histories of the sections cited by the Infirmary that would suggest a result different from the one we reach here.

II. Equal Protection
Sections 1, 6, and 22 of the Declaration of Rights combine to guarantee equal protection under the laws of Alabama.[6]Ex Parte Branch, 526 So.2d 609 (Ala.1987); Mayo v. Rouselle Corp., 375 So.2d 449 (Ala.1979); Black v. Pike County Comm'n, 360 So.2d 303 (Ala.1978); City of Hueytown v. Jiffy Chek Co. of Alabama, 342 So.2d 761 (Ala.1977); Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939). The guarantee of equal protection prohibits "class legislation arbitrarily discriminatory against some and favoring others in like circumstances." Opinion of the Justices, No. 102, 252 Ala. 527, 530, 41 So.2d 775, 777 (1949).
However, the legislature may, in the exercise of its police power, create reasonable classifications in order to eradicate or ameliorate what it perceives to be a social evil. Southern Express Co. v. Whittle, 194 Ala. 406, 423, 69 So. 652, 657 (1915). In reviewing the constitutionality of such legislation, the sole function of the *166 judiciary is to determine whether, in the exercise of its police power, the legislature has "unreasonably" encroached upon "private rights" vouchsafed to the people of this state by the Constitution. McAdory, 246 Ala. at 13, 18 So.2d at 818.
The critical inquiry thus becomes "whether the limitation imposed [on private rights] is ... one whose purpose and effect go no further than [to] throw reasonable safeguards in the public interest around the exercise of the right." Id. In addition, "there must be some reasonable relation to the regulation and to the ends to be attained." Id. The legislature may not, in the reasonable exercise of its police power, create classifications "to prevent evils of a remote or highly problematical character. Nor may its exercise be justified when the restraint imposed upon the exercise of a private right is disproportionate to the amount of evil that will be corrected." City of Russellville v. Vulcan Materials Co., 382 So.2d 525, 527 (Ala.1980). Therefore, whether the classifications created under § 6-5-544(b) represent a reasonable exercise of legislative power depends on whether they are reasonably related to the stated objective, and on whether the benefit sought to be bestowed upon society outweighs the detriment to private rights occasioned by the statute. Mount Royal Towers, Inc. v. Alabama Bd. of Health, 388 So.2d 1209 (Ala.1980); Bolin v. State, 266 Ala. 256, 259, 96 So.2d 582, 585 (1957); McAdory, 246 Ala. at 13, 18 So.2d at 818; Southern Express Co. v. Whittle, 194 Ala. 406, 69 So. 652 (1915); see also Carson v. Maurer, 120 N.H. 925, 933, 424 A.2d 825, 831 (1980); Condemarin v. University Hosp. 775 P.2d 348, 356-57 (Utah 1989).
The legislative purpose behind the enactment of § 6-5-544(b) is expressed in Ala. Code 1975, § 6-5-540, as follows:
"It is hereby declared by the legislature of the state of Alabama that a crisis threatens the delivery of medical services to the people of Alabama and the health and safety of the citizens of this state are in jeopardy. In accordance with the previous declaration of the legislature contained in Act 513 of the regular session of the 1975 Alabama legislature it is the declared intent of this legislature to insure that quality medical services continue to be available at reasonable costs to the citizens of the state of Alabama. This legislature finds and declares that the increasing threat of legal actions for alleged medical injury causes and contributes to an increase in health care costs and places a heavy burden upon those who can least afford such increases, and that the threat of such actions contributes to expensive medical procedures to be performed by physicians and other health care providers which otherwise would not be considered necessary, and that the spiraling costs and decreasing availability of essential medical services caused by the threat of such litigation constitutes a danger to the health and safety of the citizens of this state, and that this article should be given effect immediately to help control the spiraling cost of health care and to insure its continued availability...."
(Emphasis added.) Section 6-5-540 thus indicates that the "crisis" endangering the "health and safety" of Alabama citizens consisted of the potential unavailability of health care as a result of the rising cost of malpractice insurance, which, in turn, stemmed from the "increasing threat of legal actions for alleged medical injury."
In an attempt to increase the availability of health care, the legislature placed a $400,000 limit on noneconomic damages recoverable against physicians. The Infirmary contends that the $400,000 limitation is calculated to improve the availability and affordability of health care by reducing the size of "health care liability claims," thereby "making insurance at reasonable, affordable rates available to health care providers." Brief of Appellee, at 52.
Ms. Moore, however, contends that the imposition of the damages cap creates a number of classifications. In particular, she insists that § 6-5-544(b) not only creates a favored class of tort-feasors, based solely upon their connection with health care, but also creates favored subclasses within the favored class by shielding those health care providers whose actions are the *167 most egregious. Because, she insists, the statute precludes full recovery of only those most severely injured, it creates classifications based upon the severity of the injury. We agree.
The issue, therefore, is whether the connection between the benefit sought to be conferred on society and the means employed to accomplish it, when weighed against the inequalities created by the statute's classifications, is so attenuated and remote as to constitute an unreasonable exercise of police power. A seminal study conducted by the United States General Accounting Office ("GAO") suggests that the connection between damages caps and the total cost of health care is, indeed, remote.
In response to a request from members of Congress, the GAO conducted a study on, inter alia, the effect on malpractice insurance of various statutory reforms enacted in response to the escalation of insurance costs of the 1970's. The GAO issued its findings in 1986 and 1987 through a series of published reports.
The GAO study found "no consensus among the interest groups [surveyed] that any of the reforms implemented in response to the situation experienced in the mid-1970's ... had a major effect" on the cost of malpractice insurance. General Accounting Office, Medical Malpractice: No Agreement on the Problems or Solutions, HRD-86-50 (February 1986), at 3 ("HRD-86-50"). Despite the fact that statutory reform, including damages caps, had been in place for nearly 10 years in some states,[7] the GAO found that in the period "[f]rom 1983 to 1985, total medical malpractice insurance costs for physicians and hospitals rose from $2.5 billion to $4.7 billion." General Accounting Office, Medical Malpractice: Insurance Cost Increased but Varied Among Physicians and Hospitals, HRD-86-112, at 2 (September 1986) ("HRD-86-112"). (Emphasis added.) It noted that the increase in the cost of malpractice insurance to health care providers greatly exceeded the "change in either the consumer price index or the medical care index." Id. at 2-3. The GAO could identify "no clear answer as to the causes of the increases in the cost of medical malpractice insurance." General Accounting Office, Medical Malpractice: A Framework for Action, HRD-87-73, at 2 (May 1987) ("HRD-87-73"). Nor could it identify any "specific action ... that would guarantee that insurance rates [would] not continue to increase." Id.
At this point, it must be noted that the GAO study did not attempt specifically to assess the impact of damages caps on the cost or availability of malpractice insurance. Its primary value to our appraisal of the reasonableness of § 6-5-544(b) lies in the insight the study provides into the relative importance to the total cost of health care of the various components of the total implicated by the statute.
In that connection, the GAO noted that the cost of malpractice insurance was the product of a number of elements and that the size and frequency of claims resulting from damages awards or settlements were only two of those elements. HRD-87-73, at 8. Other elements influencing the cost of malpractice insurance included "administrative expenses, marketing costs, investment income, taxes, profits, extent of state regulation, and amount of competition in the market." Id. at 31. The study also cited the "availability of reinsurance, [and the] extent of competition in the market" as contributing factors. General Accounting Office, Medical Malpractice: Six-State Case Study Shows Claims and Insurance Costs Still Rise Despite Reforms, HRD-87-21, at 9 (December 1986) ("HRD-87-21").
Not only does it appear that the element of damages awards composes but a fraction of the cost of malpractice insurance, but the study also revealed that malpractice insurance costs made up only 9 percent of the "total professional expenses" for self-employed physicians. HRD-86-112, at *168 3. "Nonphysician payroll," composing 33 percent of total expenses, ranked at the top of the list. "Office expense" and "medical supplies" ranked behind payroll at 26 and 11 percent of total expenses respectively. Only "medical equipment" ranked below malpractice insurance costs, at 6 percent of total professional expenses. Id. at 4. Indeed, the study revealed that despite the increase in cost of malpractice insurance between 1983 and 1985, "total physician premiums," as of September 1986, "still [composed] less than 1 percent of the country's total health care costs" based on the 1984 figure of approximately $390 billion. Id. at 25.
Other studies addressing the effects of the "tort reform" of the mid-1970's have largely corroborated the GAO's conclusions. One study concluded that damages caps could reduce the number and size of claims paid out as a result of settlements or damages awards. P. Danzon, The Effects of Tort Reforms on the Frequency and Severity of Medical Malpractice Claims, 48 Ohio State L.J. 413, 416 (1987). The author noted, however, that her studies did not address the "effect of tort reforms on malpractice insurance rates." Id. at 417. (Emphasis added.)
Another study attempted to establish a correlation between various approaches to tort reform and the price of malpractice insurance; nevertheless, the author noted: "To date, no one has isolated the effects of specific legislative actions on either the price or availability of malpractice insurance." F. Sloan, State Responses to the Medical Malpractice Insurance "Crisis" of the 1970's: An Empirical Assessment, 9 J. Health Politics, Policy, and Law 629, 630 (1985). The author concluded:
"Whereas many of the potential sources of premium inflation are national in scope, deliberate action has been undertaken mostly at the state level. The empirical results of the study presented here give no indication that individual state legislative actions, or actions taken collectively, have had their intended effects on premiums. [Emphasis added.] The publicity resulting from considerable legislative activity may have made juries and perhaps potential plaintiffs more aware of the cost consequences of malpractice suits. If so, this effect probably extended beyond the boundaries of any particular state.
"Another possibility is that past frequency of claims and size distribution of settlements in a state are only weakly related to premiums in the state. [Emphasis added.] Premiums are set on the basis of expected outlays, and insurers may not have based their expectations for the future on past experience. Unfortunately, state-specific data on claims frequency and dollar amounts of settlements are not available for 1974 and thereafter. However, correlations among 1974 premiums, claims filed, cases won by plaintiffs, and mean size of awards for 1970 are surprisingly low (0.3 or less). Certainly, adverse insurer experience in a given year should be reflected in higher premiums in later years, so that higher correlations were anticipated. There is a need for more `hard' empirical evidence on how insurers really [emphasis in original] form expectations and set premiums."
Id. at 643 (footnotes omitted). See generally P. Zwier and D. Piermattei, Who Knows Best About Damages: A Case for Courts' Rights, 93 Dick.L.Rev. 689 (1989).
In considering the evidence presented in these studies, we do not review the wisdom of the legislation challenged in this case. See Lankford v. Sullivan, Long & Hagerty, 416 So.2d 996, 1000 (Ala.1982). We consider it only in our assessment of the juxtaposition of the $400,000 cap to the goal of reducing the cost of health care based on information that was available to the legislature in 1987. To permit the legislature to act as the sole arbiter of such juxtaposition, would be to vacate our judicial role. Brannigan v. Usitala, 134 N.H. 50, 587 A.2d 1232 (1991); Lucas v. United States, 757 S.W.2d 687, 691 (Tex.1988).
We conclude that the correlation between the damages cap imposed by § 6-5-544(b) and the reduction of health care costs to the citizens of Alabama is, at best, indirect and remote. Although there is evidence of *169 a connection between damages caps and the size of malpractice claims filed, the size of claims is merely one among a host of factors bearing on the cost of malpractice insurance. HRD-87-73, supra, at 8, 31. Even more significantly, the cost of malpractice insurance ranks near the bottom of the list of expenses incurred by health care providers. HRD-86-112, supra, at 3-4. Consequently, the size of claims against health care providers represents but one among many elements composing the cost of malpractice premiums, which, in turn, represent only a small component of the total burden borne by health care consumers. Id. at 25.
By contrast, the burden imposed by § 6-5-544(b) on the rights of individuals to receive compensation for serious injuries is direct and concrete. The hardship falls most heavily on those who are most severely maltreated and, thus, most deserving of relief. Unlike the less severely injured, who receive full and just compensation, the catastrophically injured victim of medical malpractice is denied any expectation of compensation beyond the statutory limit. Moreover, the statute operates to the advantage not only of negligent health care providers over other tortfeasors, but of those health care providers who are most irresponsible.
On this issue, we find particularly persuasive the reasoning of former Chief Justice Bird of the California Supreme Court:
"The burden on medical malpractice victims is no less real by virtue of the fact that it is `noneconomic' injury which goes uncompensated....
"For a child who has been paralyzed from the neck down, the only compensation for a lifetime without play comes from noneconomic damages. Similarly, a person who has been hideously disfigured receives only noneconomic damages to ameliorate the resulting humiliation and embarrassment.
"Pain and suffering are afflictions shared by all human beings, regardless of economic status. For poor plaintiffs, noneconomic damages can provide the principal source of compensation for reduced lifespan or loss of physical capacity....
"....
"There is no logically supportable reason why the most severely injured malpractice victims should be singled out to pay for special relief to medical tortfeasors and their insurers. The idea of preserving insurance by imposing huge sacrifices on a few victims is logically perverse. Insurance is a device for spreading risks and costs among large numbers of people so that no one person is crushed by misfortune. (See generally, Keeton, Basic Insurance Law (1960) p. 484.) In a strange reversal of this principle, the statute concentrates the costs of the worst injuries on a few individuals."
Fein v. Permanente Medical Group, 38 Cal.3d 137, 173, 211 Cal.Rptr. 368, 393-94, 695 P.2d 665, 689-90 (1985) (Bird, C.J., dissenting). The Supreme Court of New Hampshire has similarly observed:
"We find that the necessary relationship between the legislative goal of rate reduction and the means chosen to attain that goal is weak for two reasons:
"`First, paid-out damage awards constitute only a small part of total insurance premium costs. Second, and of primary importance, few individuals suffer noneconomic damages in excess of $250,000.'

"Jenkins, 52 S.Cal.L.Rev. at 951.
"It is also clear that the cap on damage recovery distinguishes not only between malpractice victims and victims of other torts but also `between malpractice victims with non-economic losses that exceed $250,000 and those with less egregious non-economic losses.' Jenkins, 52 S.Cal.L.Rev. at 951. We agree with the North Dakota Supreme Court that
"`the limitation of recovery does not provide adequate compensation to patients with meritorious claims; on the contrary, it does just the opposite for the most seriously injured claimants. It does nothing toward the elimination of nonmeritorious claims. Restrictions on recovery may encourage physicians to enter into practice and remain in *170 practice, but do so only at the expense of claimants with meritorious claims.'

"Arneson v. Olson, 270 N.W.2d at 135-36. It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation."
Carson v. Maurer, 120 N.H. 925, 941-42, 424 A.2d 825, 836-37 (1980) (emphasis added).
It clearly appears that § 6-5-544(b), by balancing the direct and palpable burden placed upon catastrophically injured victims of medical malpractice against the indirect and speculative benefit that may be conferred on society, represents an unreasonable exercise of the police power. We hold, therefore, that § 6-5-544(b) violates the principle of equal protection as guaranteed by §§ 1, 6, and 22 of the Constitution of Alabama.
Because this case involves no federal issue, we deem it neither necessary nor useful to identify precisely which of the two lower levels of federal scrutiny our standard of review most nearly corresponds with. State courts, in determining the scope of rights guaranteed by their own constitutions, are not compelled exactly to correlate their standards of review to the "three-tiered" scrutiny employed by the federal courts and may, in fact, provide more protection for private rights than the United States Constitution requires. Gilbreath v. Wallace, 292 Ala. 267, 271, 292 So.2d 651, 654-55 (1974); see also Denton v. Con-Way Southern Express, Inc., 261 Ga. 41, 402 S.E.2d 269 (1991); Lucas v. United States, 757 S.W.2d 687, 692 (Tex. 1988); Carson v. Maurer, 120 N.H. 925, 424 A.2d 825, 831 (1980); W. Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489, 495-501 (1977). As we explained in Mount Royal Towers, Inc. v. Alabama Bd. of Health, 388 So.2d 1209 (Ala.1980):
"Finally, heightened scrutiny of legislation which infringes on individual property rights is entirely consonant with the mandate of our state constitution, which contains numerous guarantees of personal liberties, including those relied upon by appellants in the instant case. This Court has ever maintained its vigilance on behalf of individuals encroached upon by governmental regulation. This vigilance does not imply a preference by this Court for one economic system or theory over another, but a recognition that our constitution imposes limits upon the power of the legislature to impair the exercise of individual rights."
Id. at 1214. Thus, the standard that we have applied in this case is neither new nor different; our holding is merely a reaffirmation of the standard we have traditionally applied in reviewing legislation adversely affecting private rights.
Reed v. Brunson, 527 So.2d 102 (Ala. 1988), and Chandler v. Hospital Authority of Huntsville, 500 So.2d 1012 (Ala.1986), are not contrary to this rule. Although the Infirmary contends that Reed and Chandler require the application of the federal "minimum scrutiny" standard in this case, it is clear that those cases involved challenges based on the Equal Protection Clause of the Fourteenth Amendment. Consequently, our disposition of the equal protection issues in Reed and Chandler turned on the application of federal standards of review and does not require an identical analysis in this case.
On Mr. Justice Houston's astounding assertion that the Constitution of Alabama contains no equal protection guarantee, we will not long deliberate. Suffice it to say that §§ 1, 6, and 22 so fundamentally reflect the spirit and principles embodied in the Preamble to the Constitution of the United States; the Declaration of Independence; and the principles upon which this nation was founded as to dispel any doubt that the Constitution of Alabama guarantees to the citizens of this state equal protection of the laws. See In re Dorsey, 7 Port. 293, 360-61 (Ala.1838) ("the first section of the declaration of rights ... was intended to guarantee to each citizen, all the rights or privileges which any other citizen can enjoy or possess" and assures a *171 "general equality ... as one of the fundamental rights of each citizen").
We have carefully considered the authorities cited by the Infirmary and amici, and we conclude that the portion of § 6-5-544(b) limiting damages for noneconomic loss to $400,000 violates the state constitution's guarantee of the right to trial by jury, as well as its guarantee of equal protection. Therefore, we do not address Ms. Moore's remaining constitutional challenges. The judgment is reversed and the cause is remanded to the trial court with directions to reinstate the damages award, subject only to the trial court's determination that the verdict was not flawed by bias, passion, prejudice, corruption, or other improper motive.
REVERSED AND REMANDED WITH DIRECTIONS.
SHORES, KENNEDY and INGRAM, JJ., concur.
HOUSTON, J., concurs in the result.
ALMON, J., concurs as to Part I; he expresses no opinion as to Part II.
MADDOX and STEAGALL, JJ., dissent.
HOUSTON, Justice (disagreeing with the rationale of the Court's opinion, but concurring in the result).
I. Article I, § 11, Constitution of Alabama of 1901 ("That the right to trial by jury shall remain inviolate.")
With all due respect, I think that the majority of this Court is on a crusade to a constitutional holy land[8] that cannot be found by using a compass of judicial reasoning or legal logic.
The Alabama legislature can abolish or alter even a common law cause of action so long as its doing so does not interfere with a plaintiff's right to a remedy guaranteed by § 13 of the Constitution of Alabama of 1901.[9] The power to abridge the right guaranteed by § 13 is excepted out of the general powers of government by § 36 of the Constitution.
The Alabama legislature can abolish or alter a cause of action under the Medical *172 Liability Acts of 1975 and 1987 so long as its doing so does not interfere with a plaintiff's right to a remedy guaranteed by § 13 of the Constitution.
If so, then why can the legislature not limit the amount of damages to be recovered in actions filed under the Medical Liability Act (proof of injury or "damage" being an element of a cause of action under that Act) so long as its doing so does not interfere with a plaintiff's right to a remedy guaranteed by § 13 of the Constitution?
I am a firm believer that if a person is damaged as a result of the wrongful act, omission, or negligence of another, that person should be entitled to compensatory damages that fully compensate the injured party for all damage proximately caused by the wrongful act, omission, or negligence; Tatum v. Schering Corp., 523 So.2d 1042, 1048 (Ala.1988) (Houston, J., dissenting). However, as a Justice, it is not within my power to determine the propriety, the wisdom, the necessity, the utility, or the expediency of Ala.Code 1975, § 6-5-544(b). All questions of propriety, wisdom, necessity, utility, and expediency are matters exclusively for the legislature to determine. I have the power to determine only whether the Constitution of Alabama of 1901 excepts the power to enact § 6-5-544(b) out of the general powers of government, Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810 (1944), cert. denied, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); Art. I, § 36, Constitution; or out of the legislative department of government. Constitution, Art. III, §§ 42 and 43. I agree with Justice Maddox's dissent in his discussion of McAdory; however, I believe that Art. I, § 36, of the Constitution "excepts out of the general powers of government" to remain forever inviolate, the matters declared in the Declaration of Rights. My disagreement with both the majority opinion and Justice Maddox's dissent is what I perceive to be meant by "the right to trial by jury" that is excepted out of the general powers of government. See Clark v. Container Corp. of America, 589 So.2d 184 (Ala. 1991), for my opinion as to what is meant by the words "the right to trial by jury."
The very Constitution that the majority relies on to strike down § 6-5-544(b) prohibits me from striking down a particular law or a part thereof (when the provisions of the Act are severable, as are the provisions of Act No. 87-189, 1987 Acts of Alabama, which includes § 6-5-544(b)) as unconstitutional because I disagree with the law or parts thereof. If the legislature, which has plenary power subject only to the restraints of the Alabama Constitution (Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334, 353 (Ala. 1980); Ex parte Foshee, 246 Ala. 604, 21 So.2d 827 (1945); Sheppard v. Dowling, 127 Ala. 1, 28 So. 791 (1900)), has the power to enact the law, then the Constitution (§§ 42 and 43) prohibits this Court, which has the power to determine the extent of any constitutional restrictions on the powers of government, from thwarting the legislative power by declaring that law unconstitutional.
The majority of this Court holds that § 6-5-544(b) violates Article I, § 11, Constitution. In § 6-5-544(b), the legislature does not attempt to change the number of jurors, the impartiality of jurors, or the unanimity of jurors, which legislative restrictions or amplifications must not deny or impair (Kirk v. State, 247 Ala. 43, 22 So.2d 431 (1945); Baader v. State, 201 Ala. 76, 77 So. 370 (1917); Culbert v. State, 52 Ala.App. 167, 290 So.2d 235 (1974); Brown v. State, 45 Ala.App. 391, 231 So.2d 167 (1970); Dixon v. State, 27 Ala.App. 64, 167 So. 340 (1936), cert. denied, 232 Ala. 150, 167 So. 349 (1936); Judge Walter B. Jones, Trial by Jury in Alabama, 8 Ala.L.Rev. 274, 277 (1956); 16 Ruling Case Law 181 (1917)); but I find that in the following sentence of § 6-5-544(b), the legislature does attempt to impinge upon the factfinding function (see Clark v. Container Corp. of America, supra) and the function of applying the law to the facts (see Nichols v. Seaboard Coastline Ry., 341 So.2d 671, 676 (Ala.1976))functions of the impartial, duodecimal, and unanimous jury:
"During the trial of any action neither the court nor any party shall advise or infer to the jury that it may not return *173 an award for noneconomic losses in excess of an amount specified herein [$400,000]; in the event the jury is so advised or such inference is made, the trial court, upon motion of an opposing party, shall immediately declare a mistrial."
Because there is no prohibition against it in the Constitution of Alabama, the legislature has the power to change the law of damages. Sheppard v. Dowling, supra; Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Broadway v. State, 257 Ala. 414, 60 So.2d 701 (1952); Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629 (1952). The legislature changed the law of damages in the Alabama Medical Liability Act of 1987 by limiting recovery for "noneconomic losses" to $400,000.
In Wood's Mayne on Damages § 791, at 739 (3d English ed. and 1st American ed. 1880), the following appears:
"It was always admitted that in cases where the amount of damages was uncertain, their assessment was a matter so particularly within the province of the jury that the Court could not alter it."
It is the duty of the jury to try the facts and apply the law to those facts. Clark v. Container Corp. of America, supra; Mathews Bros. Const. Co. v. Lopez, 434 So.2d 1369, 1375 (Ala.1983); Plenkers v. Chappelle, 420 So.2d 41, 44 (Ala.1982); McArdle v. State, 408 So.2d 491, 493 (Ala. 1981); Nichols v. Seaboard Coastline Ry., supra; Southern Ry. Co. v. Terry, 268 Ala. 510, 512, 109 So.2d 919 (1959).
The above-quoted sentence from § 6-5-544(b) purports to keep the law from the jury. How can the jury perform its factfinding function and apply the law to the facts, if the law is kept from the jury? It has always been the duty of the court to determine the law and to direct the jury to apply the law given to it by the court to the facts. Mathews Bros. Const. Co. v. Lopez, supra; Plenkers v. Chappelle, supra; McArdle v. State, supra; Nichols v. Seaboard Coastline Ry., supra; Southern Ry. Co. v. Terry, supra.
"The jury are to receive the law from the court.... This is a part of the police-power, so to speak, of the court, often necessary to prevent confusion and insure the orderly administration of justice in the trial court."
Harrison v. State, 78 Ala. 5, 12 (1884).
By prohibiting the trial court from giving the lawthe $400,000 cap on noneconomic damagesto the jury, the legislature is keeping from the jury an element that is essential for it to perform its function of applying the law to the facts.
"[T]he right to trial by jury shall remain inviolate." Section 11, Constitution. "[E]verything in this Declaration of Rights [which includes § 11] is excepted out of the general powers of government, and shall forever remain inviolate." Section 36, Constitution.
Because I view the right to trial by jury as guaranteed by § 11 as the right to have an impartial, duodecimal, unanimous body find facts and apply the law (as given to it by the court) to those facts, I am of the opinion, after careful deliberation, that a law specifically prohibiting a court from giving to a jury the law that a jury would traditionally apply to the facts and requiring the court to apply that law after a jury has completed its deliberations impinges upon the right to trial by jury, and that the power to enact such a law is excepted out of the power of government by § 36, Constitution.
Because the provisions of the Medical Liability Act are severable, I would hold that only the following sentence in § 6-5-544(b) is unconstitutional:
"During the trial of any action neither the court nor any party shall advise or infer to the jury that it may not return an award for noneconomic losses in excess of an amount specified herein [$400,000]; in the event the jury is so advised or such inference is made, the trial court, upon motion of an opposing party, shall immediately declare a mistrial."
In my opinion, the remainder of § 6-5-544(b) is constitutional.
I would reverse the judgment of the trial court and remand for a reinstatement of the jury verdict.
*174 Understandably, in this case, there was no objection to the trial court's charge, which failed to instruct the jury that it could not award a sum in excess of $400,000 in noneconomic losses. Therefore, the instruction of the trial court to the jury became the law of the case. Blumberg v. Touche Ross & Co., 514 So.2d 922 (Ala. 1987).
The jury followed the trial court's instructions and awarded noneconomic damages without being bridled by the $400,000 legislative cap. It would have been error for it not to do so, even though the trial court's instructions on the lawwhich were consistent with the majority's opinion in this casewere erroneous, Nowogorski v. Ford Motor Co., 579 So.2d 586, 590 (Ala.1990); Burkett v. Burkett, 542 So.2d 1215 (Ala.1989). If the trial court's instruction had been specifically objected to on the basis that the trial court should have told the jury of the $400,000 cap, then I would have voted to reverse the judgment and remand the case to the trial court for a new trial.

II. The alleged equal protection of law guarantee created by §§ 1, 6, and 22, Constitution of Alabama of 1901.
A plurality of this Court holds that § 6-5-544(b) violates an equal protection guarantee of the Alabama Constitution. This is certainly a crusade to a constitutional never-never land, for there is no equal protection clause in the Constitution of 1901.
In Opinion of the Justices No. 102, 252 Ala. 527, 530, 41 So.2d 775, 777 (1949), this Court noted:
"We point out that there is no equal protection clause in the Constitution of 1901. The equal protection clause of the Constitution of 1875 was dropped from the Constitution of 1901."
This is correct.[10] On the 37th day of the proceedings of the Constitutional Convention of 1901, the delegates conducted a detailed discussion of what was Article I, § 2, of the Alabama Constitution of 1875 ("That all persons resident in this state, born in the United States, or naturalized, who shall have legally declared their intention to become citizens of the United States, are hereby declared citizens of the State of Alabama, possessing equal civil and political rights"). See 2 Official Proceedings of the Constitutional Convention of 1901, pp. 1622-34. On the 38th day, § 2 was laid on the table by a vote of 49 to 42. 2 Official Proceedings, pp. 1639-44. This was done with the understanding that anything contained in § 2 of the Alabama Constitution of 1875 was covered by the 14th Amendment to the United States Constitution. Upon the third reading of the Preamble and Article I, Declaration of Rights, § 2 of the Constitution of 1875 was deleted by a vote of 116 to 2. 2 Official Proceedings, pp. 2254-60.
The equal protection applicable to persons within the State of Alabama is not guaranteed by any section or combination of sections of the Constitution of Alabama, but is guaranteed by the 14th Amendment to the United States Constitution:
"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they *175 reside. No state shall ... deny any person within its jurisdiction the equal protection of the laws."
Reviewing the earliest case cited for the proposition that §§ 1, 6, and 22 of Article I (the Declaration of Rights) of the Constitution guarantee equal protection, I found the following statement:
"Sections 1, 6, 22, State Constitution; Amendment 14, Federal Constitution, U.S.C.A.:
"These taken together guarantee the equal protection of the laws [14th Amendment, U.S. Constitution], protect persons as to their inalienable rights [§ 1, Alabama Constitution]; prohibit one from being deprived of his inalienable rights without due process [§ 6, Alabama Constitution]; and prohibit irrevocable or exclusive grants of special privileges or immunities [§ 22, Alabama Constitution].
"It is claimed that by those principles the legislature cannot legalize a negligent injury to one's person or property, thereby changing the rule of duty not to cause damage by a negligent act, whether that duty is a creature of the common law or statute. It is thought that to do so deprives one of `life, liberty, or property' without due process (section 6, Constitution), because such rights are inalienable under section 1, and create a special privilege under section 22, and violate the equal protection of the Fourteenth Amendment."
Pickett v. Matthews, 238 Ala. 542, 545, 192 So. 261, 264 (1939).
An unofficial annotation to Art. I, § 22, of the Constitution, omitting the reference to the 14th Amendment to the United States Constitution, suggested the following as the holding of Pickett v. Matthews, supra: "And sections 1, 6, and 22 taken together guarantee the equal protection of the laws." Ala.Code 1975, Vol. 1, p. 168 (1977); Ala.Code 1940 (Recompiled 1958), Vol. 1, p. 89.
Without citations of authority or explanation, this Court in City of Hueytown v. Jiffy Chek Co. of Alabama, 342 So.2d 761 (Ala.1977), held that §§ 1, 6, and 22 of the Alabama Constitution combine to guarantee equal protection of the laws.
In Peddy v. Montgomery, 345 So.2d 631, 633 (Ala.1977), this Court wrote:
"Any doubt about whether the Constitution of Alabama contained an equal protection provision was dispelled in Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), where it was held that §§ 1, 6, and 22 of Article I of the Constitution of 1901, taken together, guarantee the equal protection of the laws.... In 1871, referring, of course, to an earlier constitution which contained the same provisions as the 1901 version [which was an inadvertent misstatement, for it did not], this Court said:
"`... According to our constitution, "All men are created equal;" ...' O'Neal v. Robinson, 45 Ala. 526, 534 (1871)."
Article I, § 1, of the Constitution of 1901 does not contain the words "all men are created equal" but "all men are equally free and independent"; this difference in wording makes a great difference in determining whether there is an implied equal protection guarantee in the Constitution of 1901 in face of the unquestioned removal of the equal protection provision from the Constitution of 1901 by the delegates to the Constitutional Convention.
Black v. Pike County Commission, 360 So.2d 303, 306 (Ala.1978), cites only City of Hueytown, supra, for the proposition.
Mayo v. Rouselle Corp., 375 So.2d 449 (Ala.1979), cites Peddy v. Montgomery, supra, and Pickett v. Matthews, supra. The only other case cited in the majority opinion for this proposition is Ex parte Branch, 526 So.2d 609, 619 (Ala.1987), which quotes Ex parte Jackson, 516 So.2d 768 (Ala. 1986), which relied on City of Hueytown, supra.
If I were drafting a constitution, I would make certain that there was an equal protection clause in that constitution; however, there is not one in the Alabama Constitution.
Is there an assurance of equal protection under the laws in the present Alabama *176 Constitution? Even if the delegates to the Constitutional Convention did not intend for there to be an equal protection provision in the Constitution of 1901, such a right could arise from a combination of provisions in that Constitution.
Section 1 provides:
"That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."
Section 6 provides:

"That in all criminal prosecutions, the accused ... shall not ... be deprived of life, liberty, or property, except by due process of law...."
Section 22 provides:
"That no ex post facto law, nor any law, impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."
Section 1 guarantees a person's right to be free. It does not protect a person against discriminatory laws or practices. Section 6 involves only the rights of an accused in a criminal prosecution. Section 22 permits discriminatory treatment of citizens that could conceivably be a violation of the 14th Amendment to the United States Constitution, for it permits special privileges and immunities so long as they are not "irrevocable or exclusive." How the combination of these three sections could be construed as guaranteeing equal protection of the laws, even if there were no minutes of the Constitutional Convention showing that the only equal protection afforded in Alabama is that afforded by the 14th Amendment to the United States Constitution, is beyond my comprehension.
I am disappointed and deeply distressed that the opinion, which is a plurality opinion insofar as equal protection is concerned, distorts a quote from Justice Goldthwaite's special concurrence in In re Dorsey, 7 Port. at 360-61, to strike down an act of the legislature. The plurality opinion quotes only this: "(`the first section of the declaration of rights ... was intended to guarantee to each citizen, all the rights or privileges which any other citizen can enjoy or possess' and assures a `general equality ... as one of the fundamental rights of each citizen')." Only by filling in the blanks, can we get the rest of the story and know what Justice Goldthwaite actually wrote:
"The first section of the declaration of rights, announces the great principle which is the distinctive feature of our government, and which makes it to differ from all others of ancient or modern times: `All freemen, when they form a social compact, are equal in rights, and no man, or set of men, are entitled to exclusive separate public emoluments or privileges, but in consideration of public services.' This is no empty parade of words: it means, and was intended to guarantee to each citizen, all the rights or privileges which any other citizen can enjoy or possess. Thus, every one has the same right to aspire to office, or to pursue any avocation of business or pleasure, which any other can. As this general equality is thus expressly asserted and guaranteed as one of the fundamental rights of each citizen, it would seem to be clear, that the power to destroy this equality must be expressly given, or arise by clear implication, or it can have no legal existence."
7 Port. at 360-61. (Emphasis added in part to show that the quotation relied upon by Justice Goldthwaite contained the words "All freemen ... are equal in rights" and emphasis added in part to identify that portion of this quote that was included in the plurality opinion.)
Where, O where, in the Constitution of Alabama of 1901 does the following appear?

"All freemen, when they form a social compact, are equal in rights, and no man, or set of men, are entitled to exclusive separate public emoluments or privileges, but in consideration of public services."
*177 Nowhere! Nowhere in that entire document do these words appear! These words are the first section of the declaration of rights referred to by Justice Goldthwaite. If these words did appear in the Constitution of Alabama of 1901, we would have an express provision affording equal protection, but these words do not appear in our present Constitution.
I presume that the plurality's opinion is predicated upon there being a "brooding spirit of the law" that comes from the Preamble of the Constitution of the United States, the Declaration of Independence, and "the principles upon which this nation was founded," and which pervades the words of §§ 1, 6, and 22 and a belief that in some magical way this combination guarantees equal protection under the laws, in spite of the acts of the framers of the Constitution of Alabama of 1901. Perhaps, I would be more comfortable if the plurality opinion was predicated upon there being a "brooding spirit" that pervades only § 1 of the Constitution to assure equal protection. Certainly, § 6, which is limited to an accused in criminal prosecutions, has no application in this case. Nor does § 22, which addresses ex post facto laws, impairment of obligations of contract, and irrevocable or exclusive grants of special privileges, have any application in this case. Instead of the "brooding spirit," I fear that this Court's finding of an equal protection guarantee in these sections is based upon its reliance on the misguided finger of an unofficial annotator of Art. I, § 22. Of that annotator it unfortunately may be said:
"The Moving Finger writes; and, having writ,
Moves on: nor all your Piety nor Wit Shall lure it back to cancel half a Line, Nor all your Tears wash out a Word of it."
Edward FitzGerald, The Rubáiyát of Omar Khayyám (4th ed. 1879).
Or perhaps the unofficial annotator of Art. I, § 22, could best be compared with Sam Walter Foss's primeval calf in the poem quoted in its entirety in Justice Jones's opinion in Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 618-19, 320 So.2d 631 (1975):
"One day through the primeval wood A calf walked home, as good calves should;
But left a trail all bent askew, A crooked trail, as all calves do.
Since then, three hundred years have fled,
And, I infer, the calf is dead. But still he left behind this trail, And thereby hangs my moral tale.
The trail was taken up next day By a lone dog that passed that way; And then a wise bell-wether sheep Pursued the trail o'er vale and steep,
And drew the flock behind him, too, As good bell-wethers always do. So from that day, o'er hill and glade, Through those old woods a path was made,
And many men wound in and out, And bent and turned and dodged about, And uttered words of righteous wrath, Because `twas such a crooked path;
But still they followeddo not laugh The first migrations of that calf, And through this winding woodway stalked Because he wabbled when he walked.
This forest path became a lane, That bent and turned and turned again; This crooked lane became a road, Where many a poor horse, with his load,
Toiled on, beneath the burning sun, And traveled some three miles in one. And thus a century and a half They trod the footsteps of that calf.
The years passed on with swiftness fleet, The road became a village street, And this, before men were aware, A city's crowded thoroughfare.

*178 And soon the central street was this Of a renowned metropolis. And men two centuries and a half Trod the footsteps of that calf.
Each day a hundred thousand rout Followed the zigzag calf about; And o'er his crooked journey went The traffic of a continent.
A hundred thousand men were led By one calf near three centuries dead. They followed still his crooked way, And lost one hundred years a day;
For thus such reverence is lent To well-established precedent. A moral lesson this might teach, Were I ordained and called to preach. For men are prone to go it blind Along the calf-paths of the mind, And toil away from sun to sun To do what other men have done.
They follow in the beaten track, And out and in, and forth and back, And still their devious course pursue To keep the path that others do.
But how the wise old wood-gods laugh, Who saw the first primeval calf! Ah! many things this tale might teach; But I am not ordained to preach."
As Justice Shores wrote in Jackson v. City of Florence, 294 Ala. 592, 598, 320 So.2d 68, 73 (1975):
"As strongly as we believe in the stability of the law, we also recognize that there is merit, if not honor, in admitting prior mistakes and correcting them."
We should admit our prior mistake in regard to equal protection, so that equal protection challenges will be made under the 14th Amendment to the United States Constitution and not under some misconceived and misquoted right under the Constitution of Alabama of 1901.
ALMON, Justice (concurring specially).
I concur in Part I of the majority opinion, which holds that § 6-5-544(b), Ala.Code 1975, violates Art. I, § 11, of the Alabama Constitution of 1901. Because that holding disposes of this case, I see no need to reach the equal protection challenge addressed in Part II of the opinion and, therefore, I express no opinion as to Part II of the main opinion.
MADDOX, Justice (dissenting).
It has been said that "[a] dissent in a court of last resort is an appeal to the brooding spirit of the law, to the intelligence of a future day, when a later decision may possibly correct the error into which the dissenting judge believes the court to have been betrayed."[11]
Thomas Jefferson thought that each judge should write an opinion in every case so as to "throw himself in each case on God and country; both will excuse him for error and value him for honesty."[12] It is with Jefferson's admonition in mind that I express my reasons for dissenting, and I begin with this quote:
"[I]t is the recognized duty of the court to sustain [an] act unless it is clear beyond reasonable doubt that it is violative of the fundamental law."
Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 18 So.2d 810 (1944).
That principle of law is short, it is clear, it is easy to apply, and it should be applied. The majority, in a lengthy opinion, tries to explain why that settled principle of law does not apply in this case, but I think that they fail in their explanation.
Just a decade ago, in Reese v. Rankin Fite Memorial Hospital, 403 So.2d 158 (Ala.1981), this Court had before it a question concerning the constitutionality of the Medical Liability Act, and in that case the Court quoted the McAdory principle I set *179 out at the beginning of this dissent to uphold that Medical Liability Act on the ground that the legislature had the power to address a health care crisis in Alabama. Today, a different Court construes legislation not unlike that considered in Reese, and comes to the opposite conclusion, and, I believe, embarks on a new track, a track that not only disregards principles of separation of powers of government, but treats legislative acts without any presumption of validity. It is a dangerous and destructive track.
During the entire history of this Court, except for one major departure in 1978,[13] this Court had consistently applied the rule of law expressed in McAdory that acts of the legislature are presumed to be valid, and that courts should declare them unconstitutional only when it was "clear beyond reasonable doubt" that they violated fundamental law. The Court, in Reese, quoted the McAdory rule and followed it. That rule is short and clear. It reads:
"At the outset reference may be made, as is often done, to the principles by which courts are guided when it is sought to strike down as violative of the constitution a legislative act. Uniformly, the courts recognize that this power is a delicate one, and to be used with great caution. It should be borne in mind, also, that legislative power is not derived either from the state or federal constitutions. These instruments are only limitations upon the power. Apart from limitations imposed by these fundamental charters of government, the power of the legislature has no bounds and is as plenary as that of the British Parliament. It follows that, in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law. State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487, 121 A.L.R. 283.
"Another principle which is recognized with practical unanimity, and leading to the same end, is that the courts do not hold statutes invalid because they think there are elements therein which are violative of natural justice or in conflict with the court's notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself. Nor even if the courts think the act is harsh or in some degree unfair, and presents chances for abuse, or is of doubtful propriety. All of these questions of propriety, wisdom, necessity, utility, and expedience are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of expediency or wisdom. 11 Am.Jur. pp. 799-812; A.F. of L. v. Reilly, District Court of Colorado, 7 Labor Cases No. 61, 761."
246 Ala. at 9, 18 So.2d at 814-15. (Emphasis added.) The Court makes a passing reference to the McAdory principle regarding the duty of this Court to sustain legislation, but quickly dismisses that great principle and holds that "if it clearly appears that an act of the legislature unreasonably invades rights guaranteed by the Constitution, we have not only the power but the duty to strike it down," citing Peddycoart v. City of Birmingham, 354 So.2d 808 (Ala.1978), a case authored by Mr. Justice Beatty.[14]
*180 The decision today unquestionably establishes a precedent that could be very far-reaching, in that it could be construed as granting to courts powers never before recognized to strike down acts of the legislature. What is especially troubling is the statement of what I consider to be a new rule of law, lifted out of a special concurrence filed in another case, that "[s]tatutes are presumed to comport with the constitution `[u]ntil assailed by a party whose rights are specially affected.'" Home Indemnity Co. v. Anders, 459 So.2d 836, 845 (Ala.1984). In that case, Justice Jones had cited Jones v. Black, 48 Ala. 540 (1872), as stating that proposition.[15] The Court, in following that special concurrence, overlooks the fact that a majority of this Court, in Reese, quoting from McAdory, held that "[i]t follows that, in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government." 403 So.2d at 161. (Emphasis added.)
The law in Alabama, and indeed the general law throughout the Nation, is that statutes are presumed to be valid and constitutional. 16 C.J.S. Constitutional Law § 97, p. 309 (1984). The rule is short and succinct. It is not ambiguous. It contains no qualifying phrase indicating that the presumption of validity vanishes when a person with standing challenges a statute, and I believe that the majority is wrong in holding that the presumption accorded legislative acts does not apply when the act is assailed.
The opinion in this case is lengthy, and this dissenting opinion is longer than I intended it to be initially, but length of writing, whether in support of, or in opposition to, the result reached in this case, cannot change the simplicity of the rule that "it is the recognized duty of the court to sustain [an] act unless it is clear beyond reasonable doubt that it is violative of the fundamental law." McAdory.[16]
*181 Instead of seeking to sustain the validity of the act, which McAdory calls the Court's "recognized duty," the Court unfortunately changes the rule regarding its duty and then seems to search for reasons to sustain its conclusion that the act is unconstitutional by citing cases from other jurisdictions that reach the result it desires. Furthermore, the Court cites law review articles and even goes behind the legislative finding of purpose and need, which the Constitution itself forbids it to do,[17] and concludes that "[a] seminal study conducted by the United States General Accounting Office (`GAO') suggests that the connection between damages caps and the total cost of health care is, indeed, remote." At 167. All the Court needed to do was what it did in Reese, apply the McAdory principle and leave to the legislature what belongs to the legislature and to the judiciary what belongs to the judiciary.
The Court bottoms its decision, at least in part, on the great principle of the right to "trial by jury," a principle embedded in our constitution, and a right this Court has jealously guarded, and a right the legislature has preserved "inviolate."[18]
The right to trial by jury is a most valuable right, guaranteed by both the federal and state constitutions, but the right to trial by jury is not the issue in this case. These plaintiffs had a right to trial by jury as that right was guaranteed. The majority cites Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), a case in which I joined,[19] but that case dealt with the power of the legislature to reduce the number of jurors from 12 to 6 in the trial of a will contest in county court, not with the power of the legislature to deal with the amount of noneconomic damages that may be recovered in a case arising out of the providing of health care services.[20]Gilbreath v. Wallace is not authority for the holding in this case, because that case did not involve the power of the legislature to deal with what the legislature described as a "crisis" in this State, as this case does.[21] The real *182 issue in this case is whether the legislature is going to determine when there is a "crisis," or whether this Court will make its own independent determination of that issue. Therefore, this is a case involving the doctrine of separation of powers of government, and presents the same issue presented a decade ago in Reese.
The Court has also found that the act is unconstitutional because the Court finds that it violates the equal protection guarantee of the State Constitution.
Although I agree with the plurality of the Justices that Article I, §§ 1, 6, and 22 of Alabama's Constitution combine to guarantee equal protection of the laws,[22] I cannot agree that the act is unconstitutional as violating either of those sections or as violating any guarantee of those sections "taken together."[23] The power of the legislature to classify medical malpractice actions and to make distinctions to address what the legislature found to be a crisis in the providing of health care services was established in Reese:
"To withstand an equal protection challenge, the Court need only find that the classification made by the legislature is not arbitrary and unreasonable. As this Court recently held in Tyson v. Johns-Manville Sales Corporation, 399 So.2d 263 (Ala.1981):
"A statutory discrimination between classes is held to be relevant to a permissible legislative purpose if any state of facts reasonably may be conceived to justify it."
403 So.2d at 161.
This is the third of the so-called "tort reform" laws to be declared unconstitutional in the recent past. Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991); Clark v. Container Corp. of America, 589 So.2d 184 (Ala.1991). It may not be the last one, if the rule of this case is applied to other challenges that are certain to be made.
The legislation stricken down today may or may not be good legislation. It may or may not accomplish what the legislature stated it hoped to accomplish by its passage. Another legislature, differently constituted, and presented the GAO findings and other facts this Court uses to strike down the legislation, might decide that it did not accomplish what the originating legislature thought it would accomplish. The original debates on this legislation were long and heated. The legislation was not adopted as introduced. There were *183 compromises made. That is why, in my opinion, the wisdom of the legislation should be left to the legislature in the legislative halls, and not to the Courts in the chambers of justice, unless, of course, there is "no doubt" that the legislature was without the power to pass the legislation, which is not the case here.
The question to be asked and answered, in my opinion, is not whether the legislation will accomplish what the legislature intended for it to accomplish, but whether it is "clear beyond reasonable doubt that it is violative of the fundamental law." The question is not whether the Court thinks that "there are elements [in the act] which are violative of natural justice or in conflict with the court's notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself," McAdory, 246 Ala. at 9, 18 So.2d at 815, because "[a]ll... questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern." Id. See, Reese, in which this portion of McAdory is quoted and followed. 403 So.2d at 161.
As I stated in the beginning of this dissent, I believe that the Court has made a major turn in construing legislative acts. Just a decade ago, the Court decided Reese, involving a similar act in which the legislature had made similar findings, and in which the Court applied the principles of McAdory. Today, it goes behind the legislative finding and ignores the principles of McAdory, and in doing so it has expanded the power of this Court to declare legislation to be invalid. Some of the principles expressed in the Court's opinion, especially those relating to the right of this Court to go behind legislative findings, would empower this Court to supplant its own concept of what is good or bad for what the legislature has decreed, and, by judicial interpretation, to violate that great principle that is the bedrock of our government, that there are three co-equal branches of government, and that the legislature makes the laws, the executive enforces the laws, and the judiciary interprets the laws.[24]
Because the Court embarks on a course that I believe to be quite different from the course it followed in Reese, a course that can only be described as one that would ultimately destroy the doctrine of separation of powers, I must register my most respectful disagreement, with the hope that "a later decision may possibly correct the error into which [I] believe the court to have been betrayed."
STEAGALL, J., concurs.
NOTES
[1] Given the posture of the appellant's Eighth Amendment argument, our remarks in Chandler regarding the right of the jury to fix the amount of damages recoverable should not be regarded, as the Infirmary suggests, as merely gratuitous. We were squarely confronted with a potential conflict between the Eighth Amendment and rights guaranteed by § 11 of our state Constitution as we understood them.
[2] Similar reasoning was apparently employed by the Supreme Court of Indiana in Johnson v. Saint Vincent Hosp., Inc., 273 Ind. 374, 404 N.E.2d 585 (1980), where the court summarily concluded: "It is the policy of this Act that recoveries be limited to $500,000, and to this extent the right to have the jury assess the damages is available. No more is required by Art. I, § 20, of the Indiana Constitution in this context." Johnson, 404 N.E.2d at 602.
[3] Wash. Const. art. I, § 21, provides, as does the Constitution of this state, that the "right of trial by jury shall remain inviolate."
[4] It should also be observed that the supervisory role of the judiciary was firmly established in Alabama long before the present Constitution was adopted. For example, the power of the judiciary to order a new trial where the "`sum awarded [was] so unreasonable as to show that the jury [had] not approached the subject in a proper judicial temper'" was recognized at common law. Dimick v. Schiedt, 293 U.S. 474, 482, 55 S.Ct. 296, 299, 79 L.Ed. 603 (1935). Similarly, the authority to condition a new trial upon the refusal of the plaintiff to remit a portion of an excessive verdict has been recognized since 1822. Blunt v. Little, 3 F.Cas. 760 (C.C.A.Mass. 1822); see also Richardson v. Birmingham Cotton Mfg. Co., 116 Ala. 381, 22 So. 478 (1897); Ex parte Steverson, 177 Ala. 384, 58 So. 992 (1912).
[5] Of course, an act abolishing a cause of action must not violate § 13 or other provisions of the Constitution.
[6] These sections provide:

"[§ 1] That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."
"[§ 6] That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, ... and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law...."
"[§ 22] That no ex post facto law, nor any law, impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."
[7] "As of July 1985, 12 states had legislation in effect to limit health care providers' liability." HRD-86-50, at 78.
[8] A reference to Leia Baker's summation of Justice Holmes's career in The Justice from Beacon Hill: The Life and Times of Oliver Wendell Holmes 634 (Harper Colins 1991). "[Justice Holmes] had no loyalties to any group, and he led no crusades to a constitutional holy land."
[9] It is uncertain what standard of review this Court uses when a legislative Act is challenged as being unconstitutional for violating a plaintiff's right to a remedy guaranteed by § 13 of the Constitution:

(a) The vested rights approach (the legislature could modify, limit, or abolish a cause of action if it had not already accrued or vested) was adopted and followed by this Court from 1857 (Coosa River Steamboat Co. v. Barclay & Henderson, 30 Ala. 120 (1857)) to 1978 (see Reed v. Brunson, 527 So.2d 102, 114 (Ala.1988)); and has been used since 1978; see Reed v. Brunson, supra, and Mayo v. Rouselle Corp., 375 So.2d 449 (Ala.1979). Ms. Moore's injury occurred after the effective date of Ala.Code 1975, § 6-5-544(b).
(b) The non-common law rights approach, which was advocated in Lankford v. Sullivan, Long, & Hagerty, 416 So.2d 996, 1003 (Ala.1982), provides that for a statute to be upheld it must not be arbitrary or capricious. Alabama Code 1975, § 6-5-540, declares "that a crisis threatens the delivery of medical services to the people of Alabama and the health and safety of the citizens of this state are in jeopardy" and that the Alabama Medical Liability Act of 1987 (which includes § 6-5-544(b)) was enacted "to insure that quality medical services continue to be available at reasonable costs to the citizens" of Alabama. I cannot find § 6-5-544(b) arbitrary or capricious in light of our standard of review, which "shows great deference to legislative enactments, striking them down only if no reasonable relationship can be perceived or imagined between the statute's goal and the methods used to achieve them." Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334, 353 (Ala.1980) (Shores, J., concurring in the result).
(c) The common law rights approach requires that an act abolishing or altering a common law cause of action be held unconstitutional as violative of § 13 of the Constitution unless the individual possessor of the right to a remedy receives something in return for it (individual quid pro quo) or society at large receives a benefit (the eradication of a perceived social evil). Lankford v. Sullivan, Long, & Hagerty, 416 So.2d at 1000-03; Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d at 352-54 (Shores, J., concurring in the result).
For the same reason that I could not hold § 6-5-544(b), a part of the Alabama Medical Liability Act of 1987, was arbitrary and capricious under the non-common law rights approach, I could not hold under the common law rights approach that there was no individual or societal quid pro quo for § 6-5-544(b).
[10] I fear that the opinion, which is a plurality opinion insofar as the equal protection discussion is concerned, misquotes Opinion of the Justices No. 102, supra, to indicate that §§ 1, 6, and 22 of the Alabama Constitution forbid "`class legislation arbitrarily discriminatory against some and favoring others in like circumstances.' " I do not understand that opinion as holding that. In Opinion of the Justices No. 102, immediately after this Court stated that there was no equal protection clause in the Constitution of Alabama of 1901, the following appeared:

"Of course, the due process and equal protection clauses of the Fourteenth Amendment are involved here, although no specific reference is made thereto in your inquiry.
"While the due process and equal protection guarantees are not coterminous in their spheres of protection, equality of right is fundamental in both. Each forbids class legislation arbitrarily discriminatory against some and favoring others in like circumstances."
(Emphasis added.) 252 Ala. at 530, 41 So.2d at 777.
Why must we act as if the quoted words apply to §§ 1, 6, and 22 of the Alabama Constitution, when it is clear that they apply to the equal protection clause of the Fourteenth Amendment of the United States Constitution?
[11] Musmanno, "Dissenting Opinions," 6 Kan. L.Rev. 407, 410 (1958); William O. Douglas, "The Dissent: A Safeguard of Democracy," 32 J.Am.Jud.Soc'y 104, 106 (1948).
[12] 32 J.Am.Jud.Soc'y at 106.
[13] On May 5, 1978, a majority of this Court decided to reject the rule, and in Grantham v. Denke, 359 So.2d 785 (Ala.1978), the majority, citing as authority an Arizona case, held an act of the Alabama legislature unconstitutional. Mr. Justice Beatty, who joined the majority in Grantham v. Denke, would later recognize his mistake, and he began his scholarly dissent in Fireman's Fund Am. Ins. Co. v. Coleman, 394 So.2d 334, 355 (Ala.1981), by describing Grantham v. Denke as a "judicial `tar baby.'" 394 So.2d at 355.

I thought that this Court, in Reed v. Brunson, 527 So.2d 102 (Ala.1988), had rectified the error that it had made in the Grantham case, because, in Reed, this Court reaffirmed the McAdory rule and adopted much of the rationale used by Mr. Justice Beatty in his dissent in Fireman's Fund.
[14] Peddycoart does state the principle for which it is cited, and in Peddycoart this Court did strike down a law that the Court found violated a section of the constitution, but in Peddycoart, this Court declared the act unconstitutional only after the Court had determined that there was "[no] doubt" that it violated the Constitution of Alabama. From a reading of Peddycoart, it is quite apparent that the Court, "in performing only [its] judicial function and [not encroaching] upon the separation of powers doctrine which makes the legislative branch supreme in legislative matters," found that there was "[no] doubt" that the act was unconstitutional. The Court said: "If we entertained any doubt upon the meaning of § 105, we would, of course, accord a weighty consideration to the legislative interpretation which has been manifested through the years by the passage of numerous local laws on subjects already affecting those localities through general laws." 354 So.2d at 811.

The language from Peddycoart used by the majority to excuse the performance of its duty to uphold this act, should be read in the context of the Peddycoart case. Had the Court today applied the Peddycoart "[no] doubt" test to the act it declares unconstitutional, it would have upheld the act. Consequently, Peddycoart is not authority for this Court to strike down the act under consideration.
[15] A complete reading of Jones v. Black and Cooley's Constitutional Limitations, the treatise cited in Jones v. Black, shows that the language cited in Justice Jones's special concurrence was taken out of context and that meaning was read into it that is not contained in the opinion in Jones v. Black. The Court in Jones v. Black was merely pointing out that a person must have standing in order to challenge the constitutionality of a statute. The opinion in Jones v. Black begins:

"The power of the courts to declare an act of the legislature unconstitutional and void, is too well established at the present day to be doubted; but it is a highly responsible and delicate power, and never to be exercised, unless the exigencies of the particular case require it. While the courts can not, and ought not to shun or avoid the discussion of constitutional questions, when fairly presented, they will not, and should not, go out of their way to find such topics. They will not seek to draw in such weighty matters on trivial occasions; neither will they, as a general rule, pass upon a constitutional question and decide a statute to be invalid, unless a decision upon the very point becomes necessary to the determination of the particular case. It is both more proper, and more respectful to a coordinate independent department of government, to discuss constitutional questions only when that is the very lis mota; when the particular case in hand can only be disposed of by deciding the constitutional question."
48 Ala. at 542.
[16] Instead of writing at great length, I choose instead to refer the reader to my dissent in Grantham v. Denke and to a scholarly dissent by Mr. Justice Beatty in Fireman's Fund. Mr. Justice Beatty, in his Fireman's Fund dissent, went back to the bedrock of constitutional interpretation, and, quoting from the McAdory case, said that "[the police] power must not be exercised arbitrarily or capriciously, and there must some reasonable relation to the regulation and the ends to be attained," but that "if upon the matter men may reasonably differ, in view of all the circumstances, the legislative act in the exercise of the police power must be sustained." (Emphasis by Beatty, J.). In his dissent, Mr. Justice Beatty set out succinctly the range of legislative power and the duty of this Court when asked to strike down legislation adopted pursuant to that power. Much of his dissenting opinion is quoted favorably in Reed v. Brunson, 527 So.2d at 110-12.
[17] Section 43 of the Alabama Constitution provides, in part, that "the judicial [branch] shall never exercise the legislative and executive powers, or either of them."
[18] The policy of this State, as expressed by the legislature in Ala.Code 1975, § 12-16-55, is that "all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose."
[19] I concurred in Gilbreath v. Wallace, because it was clear to me from a reading of the constitutional debates on Section 11 that the delegates intended to preserve the number of jurors at 12. It is a quantum leap from that point to hold, in this case, that the legislature cannot deal with the damages recoverable in a civil action, although the legislature could, under certain circumstances, abolish a cause of action entirely. If Gilbreath v. Wallace establishes the principle for which it is cited, then I do not agree with that aspect of its holding. Of course, Gilbreath v. Wallace does not establish such a principle.
[20] I agree with Mr. Justice Houston that Section 11 applies only to the number of jurors required, the impartiality of those jurors, and the unanimity of their verdict. He cites Kirk v. State, 247 Ala. 43, 22 So.2d 431 (1945); Baader v. State, 201 Ala. 76, 77 So. 370 (1917), and other cases for this principle.

Although I agree with Mr. Justice Houston's views on the Section 11 issue, I cannot agree with his conclusion that the act is unconstitutional because it prevents the jury from being told in advance about the limitation on damages. I frankly cannot understand how Mr. Justice Houston, if he applies the McAdory test, can conclude that "it is clear beyond reasonable doubt" that the legislature can change the law of damages but cannot put a cap on those damages unless the jury is advised, in advance, of that fact; consequently, I disagree with his special concurrence on this point.
[21] In Reese v. Rankin Fite Memorial Hospital, 403 So.2d 158 (Ala.1981), this Court, in upholding the constitutionality of the Medical Liability Act, said:

"The Medical Liability Act was the legislature's response to a crisis which developed nationwide in the 1970's. We cannot say that the equal protection provisions of the Constitution restrict its authority to withdraw the legislative grace given minors in § 6-2-8 in the field of medical malpractice claims.
"We note that a number of other states passed similar legislation during this period. While we might have drafted a different act, we cannot substitute our judgment for that of the legislative branch, whose enactments come to us clothed with a presumption of validity."
403 So.2d at 161.
[22] In Branch v. State, 526 So.2d 609 (Ala.1987), I cited this Court's case of Jackson v. State, 516 So.2d 768 (Ala.1986), in which this Court, citing City of Hueytown v. Jiffy Chek Co., 342 So.2d 761 (Ala.1977), stated specifically that "Sections 1, 6, and 22, Ala. Const. 1901, combine to guarantee equal protection of the laws." This Court, in Pickett v. Matthews, 238 Ala. 542, 545, 192 So. 261 (1939), after finding that the legislative act there being reviewed did not violate § 13 of the Constitution, said:

"But section 13 ... does not in language, nor intent, prevent the legislature from changing a rule of duty to apply to transactions which may occur thereafter. If there exists any such prohibition it must be found elsewhere in the Constitution.
"Sections 1, 6, 22, State Constitution; Amendment 14, Federal Constitution, U.S.C.A.:
"These taken together guarantee the equal protection of the laws, protect persons as to their inalienable rights; prohibit one from being deprived of his inalienable rights without due process; and prohibit irrevocable or exclusive grants of special privileges or immunities."
238 Ala. at 545, 192 So. at 264. (Emphasis added.)
Because of what this Court has said in many cases, I cannot agree with Mr. Justice Houston's treatment of the equal protection issue, although I agree with him that the act is not violative of either Section 1, 6, or 22 of our State Constitution.
[23] In Pickett v. Matthews, 238 Ala. 542, 545, 192 So. 261 (1939), this Court said that those sections "taken together" guaranteed equal protection of the laws.
[24] Section 43 of our constitution states that "the judicial [branch] shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."